In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-1925

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MELISSA CHRISTIANSEN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 08 CR 135—**Barbara B. Crabb,** *Chief Judge.*

ARGUED NOVEMBER 4, 2009—DECIDED FEBRUARY 2, 2010

Before CUDAHY, FLAUM, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Most sentencing appeals involve long (or at least medium length) prison terms. So, an appeal like the one in this case, involving a short four-month sentence, is fairly uncommon. And although the four-month sentence was imposed after the district court determined that the advisory guideline range was four to ten months based on two enhancements that are now challenged on appeal, the sentence could have easily

still been a four-month term (the range would have been zero to six months) without the two challenged add-ons. Very interesting.

Melissa Christiansen was charged in a 16-count indictment with wire fraud for defrauding several people out of money and property by posing as an expectant mother willing to give her child up for adoption. Christiansen pled guilty to four counts of the indictment. At sentencing, the district court applied both the "vulnerable victim" and "mass-marketing" sentence enhancements to Christiansen's advisory guideline range—in addition to a two-point reduction for acceptance of responsibility. The district court found a total offense level of nine with a criminal history category of one, creating an advisory guideline of four to ten months. On appeal, Christiansen argues that neither enhancement should have applied and that the court failed to properly consider the positive changes she has made in her life (under the § 3553(a) factors) when imposing the sentence.

From June 2003 until November 2006, Christiansen pretended to be a pregnant woman looking to place her unborn child with adoptive parents. She posted and responded to numerous advertisements on www.myspace.com and www.surromomsonline.com. In December of 2006, one of Christiansen's victims contacted the Pierce County, Wisconsin, sheriff's department with information regarding Christiansen's scheme and the names of others who were in contact with her. The resulting FBI investigation revealed four victims whose

communication with Christiansen affected interstate commerce enough to allow federal prosecution.

Christiansen's first victim, Renee Brown, responded to an advertisement on www.surromomsonline.com. Christiansen explained to Ms. Brown that she was pregnant with a boy and was planning to give him up for adoption. Christiansen also said that the boy's father had agreed to give up his parental rights. After exchanging messages and speaking on the telephone, Christiansen informed Ms. Brown and her husband that she had chosen them to adopt her unborn baby boy. Shortly thereafter, the Browns left their Texas home and visited Christiansen in Wisconsin. Ultimately, the Browns paid Christiansen some $1,393 to cover various "costs" incurred. Later, Christiansen explained to the Browns that the baby's father refused to terminate his parental rights. She also asked them to send her more money for formula and diapers. They declined.

Crystal Rogers, a second victim, posted an advertisement on www.surromomsonline.com explaining her desire to adopt a child. She was unable to have a child of her own after undergoing a hysterectomy. Christiansen responded to the ad and the two exchanged messages. After Rogers sent Christiansen some calling cards, they began to talk on the phone. Rogers also gave Christiansen two air conditioners, a $200 money order, and $200 through Western Union. Christiansen's con began to unravel when Rogers planned a trip to Wisconsin to meet her at an ultrasound appointment. One day before the alleged ultrasound she told Rogers that the baby

had been stillborn. Three months later, she confessed to Rogers that she had not been pregnant.

The third victim, Jenny Sumner, lived in Virginia with her life partner. After she responded to Christiansen's advertisement on www.surromomsonline.com, she and Christiansen exchanged e-mails regarding the potential adoption of Christiansen's unborn child. Sumner and her partner then traveled to meet Christiansen at an ultrasound appointment, but while they were on their way, Christiansen left them a voice mail claiming she had miscarried.

Marie Arquillo, Christiansen's fourth victim, turned out to be the wrong woman to scam. Christiansen responded to Arquillo's advertisement on www.surromomsonline.com by telling her that she was pregnant with a girl and going to give the child up for adoption. Arquillo spent $20,000 in legal fees trying to formalize the adoption before realizing she had been duped. Arquillo then created a MySpace page to warn other potential victims of Christiansen's con. She also informed local law enforcement about the ploy.

Two months later, Christiansen appeared on the Dr. Phil show where three of her victims confronted her, and she admitted that she had lied to them. In exchange for appearing on the show, Christiansen was able to enroll in a 150-day drug treatment program—which she completed. Christiansen had been an active drug and alcohol user for over 15 years but has remained clean since she completed the program. She continues to attend a 12-step program on a weekly basis.

About two years after her last con, a grand jury indicted Christiansen for wire fraud. In her presentence investigation report (PSR), the United States Probation Office recommended that Christiansen's advisory guideline range be increased by two points for mass-marketing and be decreased by two points for acceptance of responsibility. The probation office considered a two-level vulnerable-victim enhancement but decided it did not apply. Christiansen objected to the inclusion of the two-level increase for mass-marketing. The government objected to the failure to include the two-level vulnerable-victim enhancement. At sentencing, the district court overruled Christiansen's objection, sustained the government's objection, and decided that both enhancements applied.

We review the district court's application of the vulnerable-victim enhancement for clear error. *See United States v. Sims*, 329 F.3d 937, 943-44 (7th Cir. 2003) (citing *United States v. Rumsavich*, 313 F.3d 407, 411 (7th Cir. 2002); *United States v. Parolin*, 239 F.3d 922, 926 (7th Cir. 2001)). As we noted in *United States v. Rumsavich*, vulnerability is the type of fact which the trial court is uniquely well-positioned to assess because the trial judge can observe the demeanor of the defendant and witnesses and has "an opportunity to review and analyze each of the documents and exhibits and hear the testimony while observing the mental, physical, and emotional states of the victims in order to assist him with assessing the damages inflicted upon them." 313 F.3d 407, 411 (7th Cir. 2002) (citing *United States v.*

*White*, 903 F.2d 457, 463 (7th Cir. 1990)). Applying the vulnerable-victim enhancement is proper when "the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). A "vulnerable victim" is "a person (A) who is a victim of the offense of conviction . . . ; and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1 Application Note 2. Adoption fraud victims, we assume, are not unusually vulnerable because of any of the specific attributes listed—"age, physical or mental condition"—so they must fit under the "otherwise particularly susceptible to the criminal conduct" subset.

We need not reach the question of whether victims of adoption fraud are vulnerable as a group because the government only needs to prove that one victim was vulnerable in order for the enhancement to apply.[1] *United States v. Paneras*, 222 F.3d 406, 414 (7th Cir. 2000). The United States Sentencing Commission Guidelines Manual explains when to apply the vulnerability enhancement: "The adjustment would apply, for ex-

---

[1] Therefore, there is no need to distinguish *United States v. Stover*—the case the defendant primarily relies upon—because although it held that victims of adoption fraud were not vulnerable as a group, it explained that "[w]e further recognize that, given the proper set of facts, a person's infertility, if known to the defendant, might support a finding of particular susceptibility to adoption-related fraud." 93 F.3d 1379, 1388 (8th Cir. 1996).

ample, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim. But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile." U.S.S.G. § 3A1.1 Application Note 2. For example, the Eighth Circuit, in *United States v. Stover*, found that the vulnerable victim enhancement did not apply in part because it found "no evidence that defendants offered their services selectively rather than to the general public at-large. Moreover, the evidence indicates that defendants vigorously pursued the business of anyone who was willing to pay their fees, without any genuine regard for how unfortunate the clients' particular circumstances were." *See* 93 F.3d 1388 (8th Cir. 1996). In contrast, the particular susceptibility of Christiansen's victims was not merely incidental to a scheme where she was willing to defraud anyone who responded to her advertisements. Instead, she became intimately familiar with her marks before she let them continue in her scheme because she wanted to ensure she only preyed upon the most vulnerable. For example, she had Arquillo's friends and relatives write letters of reference explaining why she should choose Arquillo to be the adoptive mother of her child. One of the letters chronicled the heartbreak Arquillo felt after two of her babies died and the frustration she felt when her attempts to undergo a traditional adoption failed. After learning about Arquillo's particular vulnerability, Christiansen "chose" her to be the adoptive mother of her unborn baby. In order to

receive what she wanted from her scheme, Christiansen did not seek just any prospective parents, she sought desperate prospective parents without options. She wanted the prospective parents to need her.[2]

Similarly, Christiansen chose Sumner as a victim because she was particularly susceptible. In the first e-mail Sumner sent to Christiansen, she wrote, "For many years we tried to have our own baby through artificial insemination, but never succeeded. All we had was doctors, sperm donors, medical bills, surgeries, pills and shots to help the process along and many tears of disappointment." In Sumner, Christiansen again found exactly what she wanted: someone who needed Christiansen in order to make her dream of having a baby come true. Therefore, since Christiansen knew that at least two of her victims were particularly susceptible to her fraud, the district court correctly applied the vulnerable-victim enhancement.

U.S.S.G. § 2B1.1(b)(2)(A) calls for a two-level enhancement if the underlying fraud offense "was committed through mass-marketing." The commentary to the mass-marketing enhancement explains that "mass-marketing" includes "a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail,

---

[2] During sentencing, Chief Judge Crabb noted, "I don't think you were necessarily in it for money . . . you just wanted to be looked up to and appreciated and have people think I'm going to be nice to this woman because she has something that I want from her."

the Internet, or other means to induce a large number of persons to (*i*) purchase goods or services; (*ii*) participate in a contest or sweepstakes; or (*iii*) invest for financial profit." U.S.S.G. § 2B1.1 Application Note 4(A). Christiansen does not contest that she had a plan that was conducted through the Internet. She argues, however, that there is no evidence to support a finding that she designed her scheme to induce a "large number" of victims. But the fact that Christiansen posted an online advertisement that was open to the public shows that she designed her scheme to induce a large number of victims. If she was interested in only inducing a small number of people, she likely would have only responded to the advertisements that already existed. Christiansen also argues that her adoption scheme did not fit into any of the three categories listed in the guidelines. But her adoption scheme fits into the first category because she was providing a service by offering to be a surrogate mother. Additionally, she intended to induce her victims to "purchase" that service. To purchase means "to obtain by paying money or its equivalent" or "to obtain by labor, danger, or sacrifice." *Merriam-Webster's Collegiate Dictionary* 1010 (11th ed. 2004). Ostensibly, Christiansen placed advertisements to give her child up for adoption. In reality, however, she was not giving anything away. Instead, she was inducing her victims to purchase her services, either by paying money or its equivalent, or by labor or sacrifice. Brown and her husband sent Christiansen $1,000 in cashier's checks. They also paid her phone bill. Rogers gave her two air conditioners, a $200 money order, and $200

through Western Union. She caused Arquillo and her husband to obtain a $20,000 second mortgage to cover legal fees and induced Sumner and her partner to spend money traveling to visit Christiansen, only to be told that the baby was lost during a miscarriage. All four of her victims attempted to purchase—through money, labor, or sacrifice—Christiansen's service as a surrogate mother. So the court properly applied the mass-marketing enhancement.

Finally, Christiansen argues that her case should be remanded for resentencing because the court failed to adequately consider all relevant factors under 18 U.S.C. § 3553(a). Christiansen is correct that a district court must give meaningful consideration to the factors listed in § 3553(a), which include the history and characteristics of the defendant, the nature and circumstances of the offense, the seriousness of the offense, the promotion of respect for the law, just punishment for the offense, the promotion of respect for the law, deterrence to criminal conduct, and protection of the public from further crimes by the defendant. *United States v. Williams*, 425 F.3d 478, 480 (7th Cir. 2005). Although the court is not required to discuss every factor set forth under § 3553(a), it must articulate the particular factors it considered in sentencing. *United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005). Further, "[W]hen a court has 'passed over in silence the principal argument made by the defendant even though the argument is not so weak as not to merit discussion' we do not have the assurance we need to satisfy ourselves that the defendant's individual circumstances have been thoroughly considered." *United States v. Harris*, 567 F.3d 846, 854 (7th Cir. 2009).

In particular, Christiansen argues that the district court did not consider her "history and characteristics" in determining an appropriate sentence. She seized upon the court's statement, "[W]hat I'm sentencing for now is not the person you are now. . . . [I]t's intended to respond to the very bad crime that you committed." Christiansen alleges that this statement shows that the court failed to consider the positive changes Christiansen had made in her life. As we have noted, Christiansen did make positive changes in her life. She no longer uses drugs and alcohol. She is married and working towards a college degree. Indeed, the court stated, "[Y]ou have made greater effort to change than almost anyone I've seen in the courtroom . . . ." Contrary to Christiansen's claim, however, the court clearly considered her history and characteristics in determining the appropriate sentence. The court stated, "You completed inpatient substance abuse treatment in 2007. You were married in 2008, and you've enrolled in college courses . . . . However, after considering the nature and circumstances of your offenses of conviction, I'm not persuaded that a sentence of probation would be sufficient to promote the statutory purpose of sentencing." The judge's statement, "what I'm sentencing for now is not the person you are now. [I]t's intended to respond to the very bad crime that you committed," simply meant that if the judge was determining Christiansen's sentence solely based on the person she is now, she likely would not have received any jail time. Instead of improperly only considering Christiansen's history and characteristics, however, the judge appropriately considered her history and charac-

teristics along with the other relevant § 3553(a) factors, such as the nature and circumstances of the offense and the seriousness of the offense. Therefore, we hold that the district court properly considered the § 3553(a) factors.

For these reasons, the judgment of the district court is AFFIRMED.